Leslie Degen was raped by a family friend repeatedly beginning at age 12 until the person moved away. To lessen the burden on his already struggling mother, he kept the childhood sexual abuse as a secret, experiencing depression and suicidal ideation throughout his teen years. Avoiding the trauma, he worked for 11 years as a janitor at UC Santa Cruz from 1987 until 1998. He left that job due to his long-standing depression and chronic foot pain, but did not seek treatment due to his Cluster A personality disorder. Is what kind of personality disorder? Cluster A. And what is that? There are different kinds of personality disorders, and in the psychiatric field, they classify them based on different characteristics. The Cluster A particularly, I'm not a medical expert, so I couldn't distinguish them all. I thought he was diagnosed as having a personality disorder, a borderline personality. Yes, borderline personality. Yes, that's correct. So I guess that's in the borderline cluster, which is further explained elsewhere. He's only recently begun to think about how this trauma influenced his life, and though he's angry and hurt, he still would never tell his mother. He has been homeless on the streets of Berkeley for the last seven years. When Mr. Dagan went before an ALJ to talk about this trauma and this vulnerability and how it impacted his life, ultimately resulting in an inability to work, the ALJ did not believe him. In a subsequent application, however, filed in April 2015, another ALJ did, in fact, find Mr. Dagan credible and disabled. On the basis of his mental limitations? Yes, that's correct. Not the foot pain? No. Yes, okay. So maybe, okay, and why are you telling us that, just to? Just to show that he was found credible and disabled at a later date, basically three years after this application, and the record shows that not much changed from 2012 to 2015. So what's at stake here, the three years? So, yes, three years back to May of 2012, the first application date. So maybe just putting aside the foot pain issue for the moment, I don't know how much you intended to say about that, but I would think your time would be more productively spent, focused on the ALJ's findings as to both the credibility and as to the weighing of the medical evidence? Yes, yes, that's certainly the bulk of my argument. Great. Okay. All right, and so, you know, as was pointed out by the ALJ and Commissioner, Mr. Dagan was unable to access medical treatment until approximately 2013. And from that time to the present, he has stayed in treatment consistently, and his symptoms of depression and anxiety and borderline personality have been consistently documented since that time. Can I ask you, you say he was unable because of his mental limitations or because of what happened other than maybe his getting in touch with your group? What caused him to suddenly, after all those years of suffering, to seek treatment? Yes. Basically, Mr. Dagan and I met when he walked through our doors, and I informed him that he could try to access treatment. He was very skeptical of the medical system when I met him, and what's, you know, pretty thoroughly developed is this question of, well, our position is that he did not access the treatment earlier because of his, precisely because of the mental impairment, because of the borderline personality, which includes very poor insight and judgment. Most people with borderline personality do not realize that they have a severe mental illness that needs treatment, and so they often don't access treatment. And also as evidenced by the fact that, you know, he did not share even the childhood sexual abuse with his own mother, you know, he was not likely to share those kinds of very personal details with a complete stranger when he already has skepticism around the medical industry. And the borderline and personality traits certainly make it difficult for him to trust people. The sexual abuse also caused him to be, and he stated that in a number of his reports, that he has difficulty trusting people in general. Help me again, because we're talking about which three years? 2012 to 2015. About 2015. Yes. And the last time that he worked as a janitor was when? 1998. So he's been unemployed for 20 years. He has not worked at all since then. And he describes, does he not, his pattern of behavior after 1998 as, I guess, chilling out, but also engaging in bike riding, athletics, reading, he did a lot of reading, and music. He was a musician. And he engaged in all of those activities after 1998 when he sold his house and decided to live on the income from that house. Right. So he did own a house at the time. He sold it and left off the proceeds until those ran out. And as he testified at the first ALJ hearing also, after those funds ran out, he became homeless again. He stayed with, I believe, an uncle for some time. Can I ask you a question about the fundamental timing here? So he begins, at your urging, to see a therapist. He begins then taking Zoloft. He responds well. Then he goes off Zoloft. And then he sees Dr., as I understand it, Dr. Franklin. And Dr. Franklin does her evaluation, which suggests that he's disabled, when he's off Zoloft. And then also Dr. Frankel does her observation in March of 2014 when he's off or just getting back onto Zoloft. And then thereafter, he gets on Zoloft. And apparently, at least the progress notes from Dr. Franklin suggest, he's doing much better. Is that correct? I don't think entirely, Your Honor. And I think if I can point out a small distinction, there are two doctors in this record that treated Mr. Dagan whose names are very similar. One is Dr. Frankel, who is the treating psychiatrist. And then the examining psychologist is Dr. Leslie Franklin. And Franklin is, I'm not sure which one this was who treated him while he was on the Zoloft. He's generally stayed on his medications. There have been some times where, due to homelessness or other circumstances, he either couldn't afford the medication or it was stolen from him or, you know, being that he's living on the street. But generally, he has been overwhelmingly compliant with his treatment regimen. Just Dr. Franklin was the psychiatrist who was the treating psychiatrist, right? Okay. Dr. Frankel is the one. I'm sorry. Frankel. Yes. Yes. And the treating psychiatrist, what I want to point out there is that she did she had been seeing him from 2013. And her opinion, I believe, was issued, yes, in February 2014. So she had been seeing him already for at least seven to eight months then. At that time, he was not on Zoloft. He had stopped Zoloft. Is that correct? I am not sure about the facts. I'm pretty sure he was still on it. But my point being that Dr. Frankel had a longitudinal treating relationship with him that she had been seeing him regularly over time. So her opinion is really a synopsis of his entire condition, not just an opinion of how he's doing on one particular day, but a holistic view of his mental condition given the seven-month treatment history. But the progress notes that Dr. Frankel wrote afterwards, after he was clearly back on Zoloft in the spring of 2014, relied upon by the ALJ, are they not, to suggest that, in fact, those progress notes are more consistent with the evaluations that were done by the State-appointed therapists? So, Your Honor, I do disagree with that, yes. And that is because the consultative examiner upon which the ALJ relied on for the basis of his decision is Dr. Peter Frank, who actually, during his evaluation, made a number of findings, including that he observed objectively that Mr. Dagan had very poor concentration, a low frustration tolerance, and was, you know, flustered during the testing. And that is consistent with Dr. Franklin's observations that he actually cried during the evaluation in frustration because of having to do these tasks and tests. And so Dr. Peter Frank's conclusion at the end of that examination in, I believe it was 2012, was that he was completely unimpaired in the ability to complete a work day and work week based on his psychological impairments, and that he had no impairment in concentration. And so that was the finding that Dr. Peter Frank made after making the objective observations, that he, in fact, did have poor concentration and a very low frustration tolerance, likely leading to a decompensation in a work setting under any amount of increased stress. So I don't think that Dr. Peter Frank's, I think that Dr. Peter Frank's opinion is actually quite inconsistent, and that Dr. Frankl's treating opinion is more consistent because her findings and documentation of symptoms over a period of time, now it's been five years, where she's been seeing these symptoms and continued severe impairments. And so I do think that Dr. Frankl and Dr. Franklin's opinions are consistent with each other, and also supported by the objective findings of the other examiners and the DDS State Agency medical consultants. Sotomayor, I'm a little, I was a little confused by this as to the basis that you think the ALJ should have found that he was disabled, whether it was because of the foot pain or whether it was because of the mental conditions or both. The foot pain, the foot situation, standing alone, just talking for myself, doesn't appear to be disabling. Sure. So what is the critical finding here of the ALJ that you think is not supported by substantial evidence? So the critical findings are that he does not meet Step 3 or Step 5 of the sequential evaluation based on listings 12.04, 12.06, and 12.08, which are the depression, anxiety, and personality disorder listings. So we can even, you know, include the physical impairments in the analysis to make him equal a listing, but even just on the mental impairments alone, we do maintain that he's disabled on the mental impairments alone, regardless of the physical impairments. Well, you're also arguing, are you not, that the ALJ did not give sufficient weight to the treating physician? That is Dr. Frankl's report. Yes, exactly. So that is the crux of our argument, and that's because Dr. Frankl really knows Mr. Dagan more than any of the other examiners do. And so her opinion, you know, should have been merited more weight. It's normally an uncontradicted treating source opinion would be given controlling weight, and if it is contradicted, you know, the ALJ should have provided specific legitimate reasons for discounting it. Dr. Frankl only saw your client one day. It was just an examination. Yes, one day for about two and a half hours. And was that at your request? That, yes. He was referred by us. Yes. How did the Dr. Peter Frank evaluation come about? I'm sorry. Almost at the two-minute mark, and would love to reserve that for rebuttal. Yeah.  Okay. What was the question? We'll have two minutes for rebuttal. Don't worry. Okay. The Dr. Peter Frank evaluation, how did that come about? That, he was referred from Social Security. That was a consultative examination paid for by Social Security. Okay. And that evaluation was, if I remember, was September of 2012. Yes. But he didn't start seeking treatment until June, you said, of 2013? Yeah. Or July? Yeah. Why the delay there? You know, again, that was, well, I think it was actually his hesitation. He was very skeptical, again, of the medical industry. It took me some time of, you know, kind of telling him, you know, explaining to him what it would be like and how it might help him. And, you know, he was very skeptical. He did not want to go see doctors. Okay. So at the time of the Dr. Peter Frank evaluation, your client wasn't on any medication at that point? Not that I know of, no. I don't think so. Okay. All right. Thank you. We'll give you your two minutes for rebuttal. Okay, great. Let's hear from Counsel for the Commissioner. Counsel for the Commissioner. Good morning, Your Honors. May it please the Court. Daniel Talbert on behalf of Nancy A. Berryhill, the Acting Commissioner of Social Security. In this case, the claimant, Mr. Dagan, stopped working in approximately 1998 and went for about 14 years, apparently, without working without any treatment until he applied for disability benefits in 2012. After he applied in 2012, when he first saw doctors, Dr. Peter Frank, the consultative examining psychologist, and Dr. Lewis, who was the examining internal medicine, I think she was an internist, specialist, examined Mr. Dagan and found some abnormalities, but indicative of at most The second doctor did not, in fact, examine him, right? She just reviewed the report of Dr. Peter Frank. Am I getting that right? No, Your Honor. Dr. Peter Frank, they both examined the claimant. Dr. Peter Frank examined him psychologically or mentally, and Dr. Lewis was for examining him for physical purposes. Let's put aside the foot stuff and just focus on the mental limitations, and maybe we can just zero in on Dr. Peter Frank's opinion, because that really is the crux of the ALJ's decision with respect to mental limitations. Wouldn't you agree? I would agree it's part of it. The ALJ is basing his opinion on Dr. Peter Frank's opinion, or I'm sorry, the ALJ is basing his decision on Dr. Peter Frank's opinion, on Dr. Lucilla and Dr. Koretsky, who were the non-examining doctors who also reviewed Dr. Peter Frank's opinion, and then on the treatment notes from Dr. Frankel and from licensed clinical social worker Kate Bartholomew. So the ALJ's findings about the claimant's mental status and mental functioning are based on those three opinions and then the treatment notes. Right. But I'm saying in terms of what supports the Commissioner's position here, it really comes down to Dr. Peter Frank's evaluation, because those other two doctors you mentioned didn't do anything other than review his report. They didn't even have access to any of Dr. Frankel's records, right? Right. That was before Dr. Frankel had treated the claimant. Right. But some important points to keep in mind there, I think I want to make two points just right now with respect to that issue. The first point is, as I think Your Honor noted earlier, when the claimant saw Dr. Peter Frank, he wasn't taking any medication. He wasn't in any sort of treatment. And the record shows that once he got into treatment and started taking medication, his mental functioning and symptoms actually improved. Well, no. Yeah. I mean, yes, improved, but not to the point where he could work. And we know that because his treating physician so opined. So, again, I mean, I don't – I think it's very hard for us sitting here to allow ALJs to basically give no weight to the treating doctor's opinions and give – put basically all their weight on this examining person, unless we look at the examining person's findings and conclude that they're really solid and that there's something suspicious or deficient about the treating physician's findings. And here I'd like you to focus on Dr. Peter Frank's evaluation, because I frankly go – I read through the first four and a half pages, and it sounds to me like, boy, this person is not going to be able to work. And then all of a sudden there's a conclusion, unimpaired, unimpaired, unimpaired. So I actually found the ultimate conclusions that Dr. Peter Frank reached to be inconsistent with the objective findings of his own evaluation. So, I mean, help me understand when I look at these pages, what am I missing? Sure. Memory poor, concentration poor, low tolerance for frustration, on and on and on. And then the conclusion is, oh, but he could work a full day just fine. And I don't understand how those two – those things can be jibed. So the first point I want to make, Your Honor, is that, respectfully, Dr. Peter Frank is a psychologist. He is an acceptable medical source, and he understands when he's examining the claimant, you know, he bases his opinion on the examination. And as this Court's decision in Tonopetian v. Halter and other cases have stated, a consultative examiner's opinion standing alone can be substantial evidence. So that's what we have from Dr. Peter Frank. The important thing to remember, again, is that he's a doctor. He's an acceptable medical source. And when he examines the claimant and says, here's my conclusion, he has poor concentration and, oh, here, poor memory, so he's mildly impaired in this category, and he makes findings of that sort, those are his findings based on his own – on his examination. That's his interpretation of it. And I think it's – that this person is perfectly unimpaired and can go out and work just like you and me. Now, I don't – Fisherman, your Honor, nobody's saying that he's completely unimpaired. Dr. Peter Frank is noting mild impairment in a few categories. And then Dr. Lucilla and Dr. Koretsky, who are the State agency – I think they're psychiatrists. They might be psychologists, but at any rate, they're State agency experts. They looked at the same examination report, the same poor findings that are of – that Your Honor has raised concern with, and they said, based on this examination, we conclude that this claimant can do simple, unskilled work with limited interactions with other people. And let's remember that these State agency doctors are, based on the regulations, they're experts in Social Security disability programs and Social Security disability evaluation. So from a lay perspective – But – yes, but hold on. But so Dr. Franklin – I don't – I mean, it just – you want us to basically say these doctors are better than these other doctors, because Dr. Franklin does the exact same thing that Dr. Peter Frank does, right, this one-time, one-off evaluation, and comes to the exact opposite conclusion. So we have that, and I don't understand why the ALJ is entitled to give more weight to Dr. Peter Frank than to Dr. Franklin. But even if it were a tie, then you have Dr. Frank Gohl, who actually has the best – is in the best position, wouldn't you agree, to give an opinion. And she, too – I think she, right, Dr. Frankl? She, yes. Yeah. She, too, says that, no, I mean, given all of this person's limitations, there is no way that they could hold down a regular job, because a lot of it, just dealing with – can't – can't deal with frustration and, you know, can't interact with people in a normal – in a normal way. So I – Let's talk about Dr. Frankl's opinion, then, Your Honor, because I would submit respectfully that she actually doesn't make the findings that Your Honor was indicating about just there was no way this person could work. On pages 452 to 453, all Dr. Frankl does is circle a few boxes, make a few checkmarks here and there. And the ALJ notes that and says this is a conclusory check-the-box form. It's not explained. And per the Commissioner's regulations and this Court's case law, numerous cases have said that if a – even a treating source who might ordinarily get greater weight, if they don't explain their opinion, if all they're doing is checking boxes, then it's not entitled to any significant weight, and the ALJ can reject it. And in this case, in this case, it's especially compelling that when you look at Dr. Frankl's treatment notes and when you look at licensed clinical social worker Bartholomew's treatment notes, you see that there aren't this – the level of disabling abnormalities. The mental status examinations, and I'm happy to – yes, Your Honor. What I find interesting about your approach, I've never seen this before, where you actually see a treating physician write the opinion saying the person is disabled, but then you say ignore that, that's inconsistent with her progress notes, and then you actually rely upon the progress notes to say that because of treatment that he received, the Zoloft in particular, all of a sudden, the disabilities, the mental disabilities that he had, were mollified, if not disabled. Your position is, as I understand it, these progress notes establish your particular position consistent with Dr. Peter Frank. Is that – is that correct? That's exactly right, Your Honor. That's what the ALJ found. So what about the progress notes before? I mean, she started – Dr. Frankl started seeing him before she prescribed and he started taking Zoloft. Are those also consistent with someone who is disabled, or are those notes always consistent with somebody who has the potential of becoming, you know, relatively employable? So I would note – I would note, Your Honor, that really all of the treatment notes from Dr. Frankl and licensed clinical social worker Bartholomew are generally consistent with the ALJ's finding that the claimant could perform a range of simple work with no public contact. But an important thing I'd also point out is that before the claimant's taking – if there's a difference between before the claimant takes medication and after he starts taking medication, that's a relevant factor that the ALJ can and must rely on. And this Court in Ware v. Commissioner stated that an impairment that can be controlled with treatment, including medication, can't be disabling. So even if this is a claimant who, at a period – as Judge Sessions noted earlier, at a period where he's not taking Zoloft, might have evaluations from Dr. Frankl and Dr. Franklin that could suggest significantly limiting symptoms and impairments, if the claimant's going to – if those are going to resolve and improve with treatment, then the claimant isn't entitled to benefits. Is there a question that could further? Sotomayor Well, if he's not able to maintain consistently his medication, which we've all known people who've had that difficult, isn't that really part of what's underlying this? Fisher No, Your Honor. This record doesn't support that. So this record shows that, again, for about 14 years – so the claimant tests – the claimant alleged that he stopped work because of disability. He testified at the hearing. Even though he amended his alleged onset date, he did testify at the hearing, I haven't been able to work full time since the 90s. He went 14 years without treatment. And then after that period, he saw again Dr. Peter Frank, and Dr. Peter Frank examined him and said, with the concurrence of two other experts in Social Security disability programs, that that examination doesn't establish disabling limitations. Then the claimant starts taking medication. Zoloft is helpful. He, around – I think it's November of 2013, and I can get citations if the Court wants to look these up, but in November of 2013, he increases his Zoloft dosage because he says that it's not helping quite as much. He has a panic attack and then is a bit worried about it and stops taking Zoloft. The doctors try to get him to take it back – to get back on it, and then around February of 2014, he does get back on it. Now, again, February 2014 is when Dr. Franklin sees the claimant when he's not – either not taking Zoloft or he's just getting back on to it. And that's when Dr. Frank all gives that opinion, too, that shows those significant limitations. But again, after the claimant starts the Zoloft and is consistently taking it, and then he starts gabapentin that Dr. Kuluva, the neurologist, gave him, that helps his anxiety. And the records from March through August of 2014 consistently show what a great relief and improvement the claimant has had from his treatment. So this is a case where – this is a case where there are opinions on both sides. There are some opinions, there's some evidence that can support a claim of disability. Dr. Franklin's examination, but then, of course, Dr. Peter Frank's examination, and Dr. Lucila and Dr. Koretsky's opinions support non-disability. And then again, Dr. Frank all's unexplained check-the-box sort of two-page form suggests – could suggest disability. But Dr. Frank all's own treatment notes, with mental status examinations often normal, licensed clinical social worker Bartholomew's treatment notes, again, showing the same thing, and both showing significant relief with Zoloft and with other medication and treatment, those support the ALJ's finding. And this is a case where, like in most social security cases, there might be evidence on both sides. But the ALJ is the fact-finder. The ALJ is the one who Congress – well, Congress has designated the Social Security Administration to make the findings, and then our ALJ is the one that's delegated to make those findings, but is the one who's the fact-finder to resolve conflicts in the evidence, as this Court said in Tomasetti v. Astru, and to make findings. And on substantial evidence review, what we're looking at is, does substantial evidence support the ALJ's finding? Is it a rational reading or interpretation of the record? And in this case, where you have a claimant who says he was disabled since 1998, doesn't have any treatment for 14 years, sees some doctors in 2012, and they find at most mild impairment. Then he gets into treatment, and that treatment is highly effective in controlling his mental and physical symptoms. But then we also have a one-off examination from Dr. Franklin that says he has these significant limitations, and unexplained opinion from Dr. Frank, all suggesting similarly high level of impairment. That's a case where the ALJ can And what we have to look at is, does substantial evidence support the ALJ's finding? Is the ALJ's finding at least one rational interpretation of the record? And here that the answer to that is definitely yes. If there are no further questions from the panel, I'll prepare to submit to request the Court to affirm the ALJ's decision as supported by substantial evidence and free of reversible legal error. Thank you. All right. Thank you very much. Let's put two minutes on the clock for Appellant's counsel. All right, Your Honors. After these ambiguities in the record are in fact resolved by a reasonable fact finder, the substantial evidence of the record does dictate a finding of disabled for Mr. Dagan. One issue to be addressed that my opposing counsel brought up was Mr. Dagan's compliance with his prescribed treatment regimen. And I want to point out another inconsistency in the ALJ's decision and his reasoning. And that goes to the question of my client's the ALJ states that Mr. Dagan's treatment and medication controls his mental and physical impairments. That's one reason for finding him not credible. In almost the same breath, the next reason is that Mr. Dagan failed to follow his treatment regimen. So I'm a little confused as to the reasoning. I'm not sure how his treatment that he's now improving because he's taking his medications and his symptoms are getting better, but yet he's also being penalized and being found not credible because he's not following his treatment regimen. I find those two findings extremely inconsistent. I don't see how my client can be found not credible based on those inconsistent reasons which are not clear or convincing, which is the standard when there's been no other evidence of malingering. There's no other piece of evidence at all in this record that shows that my client is dishonest or not forthcoming or trying to hide information. He is very honest with all of his treating providers about what's going on with him. Despite his ---- Kennedy. So the significant question to me is whether the ALJ gave adequate weight, the testimony of the treating psychiatrist here. But this is a unique case because what essentially the ALJ is saying is that the treating psychiatrist does the checkbox, comes out with a general opinion, but then in the successive months, once he's started taking Zoloft and responded positively to Zoloft, that the progress notes suggest that his behavior is not consistent with her initial diagnosis, right? And so it's almost like the progress notes are being used to impair the reliability of the initial determination. And is there something significant in the progress notes which suggests to you that even under Zoloft, taking Zoloft, Mr. Deegan continues to suffer from mental disabilities? In the progress notes that she rendered after Zoloft became ---- it was in February of 2014, he started taking Zoloft permanently. So is there something in those progress notes which reaffirms the fact that she believes that there is a significant disability? I believe there are ongoing, you know, symptoms, mental health symptoms that are disabling noted in the progress notes, which I do not have in front of me right this second. But, yes, yes, Your Honor. My answer to your question is that, yes, there are disabling symptoms and impairments documented after the Zoloft had been administered, which was when Dr. Frankel's opinion was made, was made when he was on the Zoloft, when she had been observing his behavior while it had been controlled and treated with the medication. He was off Zoloft from November of 2013 to February of 2014. She did the evaluation in February of 2014, right? And so then she continued to see him over a significant period of time. And it seems to me that those progress notes become extremely important because they either reaffirm or contradict her initial assessment. Yes. But, anyway, what you're suggesting is there's something in the progress notes which say he continues to suffer. Yes. And also I do want to point out again in our argument here that the Batson case was used by my opposing counsel to support, and he mentioned that Dr. Frankel's But in the Batson case, they found that they did not give weight to the opinion where it was based on the claimant's subjective complaints, unsupported by the objective evidence, which in this case, Dr. Frankel's conclusions are supported not only by her own objective observations and evidence, but also by the slew of testing that was results should be included in the review of the entire case evidence. And, again, neither the ALJ nor the Commissioner at all during the course of this briefing have pointed to a good reason why Dr. Frankel's opinion should be completely disregarded and given no weight as the only treating psychiatrist in this entire record. Thank you, counsel. Thank you. The case just argued will stand submitted. We'll move to the next case on the calendar, which is Hanover Insurance Company v. Paul M. Zagaras, Inc.
judges: Schroeder, Watford, Sessions